Stephen Paul Forrest - 006341 (pforrest@hofklaw.com)
Larry J. Wulkan - 021404 (lwulkan@hofklaw.com)
**HOLLOWAY ODEGARD FORREST & KELLY, P.C.**
3101 N. Central Avenue, Suite 1200
Phoenix, Arizona  85012
Phone:        (602) 240-6670
Facsimile:    (602) 240-6677    (858.095)

Douglas A. Albritton (Illinois Bar No. 6228734) dalbritton@reedsmith.com
*Pro Hac Vice* admission to be filed
Abigail D. Flynn-Kozara (Illinois Bar No. 6302188) aflynn-kozara@reedsmith.com
*Pro Hac Vice* admission to be filed
**REED SMITH LLP**
10 South Wacker, 40th Floor
Chicago, Illinois  60606
Phone:        (312) 207-6550
Facsimile:    (312) 207-6400

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The GWC Warranty Corporation,<br><br>              Plaintiff,<br><br>        v.<br><br>Daniel Blain,<br><br>              Defendant. | No.: _____<br><br><br>**COMPLAINT** |

Plaintiff The GWC Warranty Corporation ("Guardian") complains against Defendant Daniel Blain ("Blain") as follows:

### INTRODUCTION

1.        Guardian recently has learned that Blain, one of its sales-person employees, is serving two masters – in addition to working for Guardian, he also is working as an employee or independent agent for one of Guardian's direct competitors, AUL Corporation ("AUL").  This is in direct violation of his fiduciary duties to Guardian and his written employment agreement.  Given his work for AUL while an employee of Guardian, Guardian believes that Blain is continuing to work for AUL in violation of the non-competition and non-solicitation provisions of his Employment Agreement and in

pursuit of opportunities that rightfully belong to Guardian.  These circumstances make this case a significant emergency.  No company trying to do business in Arizona should be subject to conduct such as this.

2.     This case seeks, among other relief, immediate, preliminary and injunctive relief against Blain based upon his violation of the non-competition and non-solicitation provisions (among others) of his Employment Agreement, his tortious interference with Guardian's current and prospective economic relations, and for his breaches of the fiduciary duties that he owed to Guardian.  Blain engaged in these bad acts in Arizona and, on information and belief, other states, and this bad conduct has been directed toward Guardian in Arizona and Pennsylvania.

## THE PARTIES

3.     Guardian is a Pennsylvania corporation with its registered office and principal place of business in Avoca, Pennsylvania.

4.     Blain is an individual last known to reside in Mesa, Arizona.

5.     Blain recently held the title of Dealer Consultant at Guardian in which role he was responsible for marketing and selling Guardian's products to automobile dealerships within the State of Arizona and Las Vegas, Nevada.  His responsibilities are described in greater detail below.

## JURISDICTION AND VENUE

6.     This case arises under the common law of Arizona and/or Pennsylvania. Pennsylvania and Arizona law compel the same outcome, regardless of which law applies.

7.     This Court has jurisdiction over Blain because he is a citizen and resident of Arizona.  Further, this lawsuit arises out of the harm and tortious injuries that Blain caused, at least in part, in Arizona, Blain's interference with contracts that are related to Arizona and Blain's breach of an agreement that is related to Arizona.

8.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 in that Guardian is a resident of a different state than Blain, and the amount in controversy exceeds $75,000, exclusive of interests and costs.  Venue in this Court is

1
2
3
proper because a substantial part of the events or omissions giving rise to the claims occurred in this district, and also because Blain is subject to personal jurisdiction in this district.

4
5
### FACTUAL BACKGROUND
#### Guardian's Business

6
7
8
9. Guardian is engaged in the business of, *inter alia*, providing vehicle service contracts, which are sometimes referred to as extended warranties, to purchasers of vehicles throughout the United States.

9
10
10. Guardian works primarily through its relationships with its main customers, which are vehicle dealerships and finance companies.

11
12
13
14
15
11. In a typical transaction, a dealership will contract with Guardian to sell Guardian vehicle service contracts to its customers. Guardian charges the dealer a certain price, which the dealer may or may not mark up when it sells to the individual customer. Thereafter, Guardian interacts with the dealership and the individual customer to direct any vehicle service contract repairs.

16
17
18
19
20
21
12. Guardian employs Dealer Consultants to call upon auto dealerships to sell its vehicle service contract services to dealerships and to develop and maintain its customer relationships. More specifically, the Dealer Consultants use confidential and trade secret information, among other information, to interface with the dealers to (a) enroll and sell Guardian vehicle service contracts, and (b) continually educate and update dealers regarding Guardian's offerings, all for the purpose of promoting Guardian's products.

22
23
24
25
26
27
13. As a Dealer Consultant for Guardian, Blain was the primary contact between Guardian and its dealers in Arizona and Las Vegas, Nevada. He was the "face" of Guardian to these clients and was responsible for promoting and selling Guardian's vehicle service contract products to these auto dealerships. Accordingly, and like all of Guardian's Dealer Consultants, Blain was responsible for establishing and promoting Guardian's good will, relationships, and company revenue.

28

14.   As part of his employment with Guardian, Blain had regular and direct contact with Guardian's customers.

15.   Blain was compensated for his services for Guardian and received benefits from Guardian.

16.   As part of his employment with Guardian, Blain was provided with confidential and proprietary business information of Guardian, including but not limited to, sales information and strategies and pricing, identity of the customers, the history of their purchases, deviation ranges, discounts and mark-ups on products, and the sales, marketing, and business strategies

**Employment Agreement**

17.   Blain was hired by Guardian as a Dealer Manager (now known as a Dealer Consultant) in May 2001, and incident to and in exchange for his employment with Guardian he entered into an employment agreement ("Employment Agreement") with Guardian on May 16, 2001.  A true and correct copy of the Employment Agreement is attached hereto as *Exhibit A* and incorporated herein.

18.   In the Employment Agreement, Blain agreed to certain restrictions.  First, he agreed that he would devote his "entire services, skills and abilities to his employment under the terms of this agreement," with "Entire Services" meaning 100% of the time, exclusively for Guardian.  *See Ex. A, ¶* 3.a.  Second, he agreed to a one (1) year non-compete provision, pursuant to which he agreed that he would not directly or indirectly compete with Guardian in any manner within a one hundred mile radius of his sales territory.  *Id.* ¶ 3.e.  Third, he agreed that for one (1) year after his employment ended, he would not solicit or accept business from any of Guardian's customers whom he serviced or of whom he learned during his employment with Guardian.  *Id.* ¶ 3.d.

19.   Blain further agreed therein that he would maintain the confidentiality of all of Guardian's Confidential Information.  *Id.* ¶ 3.c.

**Blain's Misconduct**

20.     Blain reported to Ward Lentini, who was his supervisor and who holds the title "Regional Manager."

21.     As such, Blain periodically was required to fax certain documents to Ward.

22.     On or about September 24, 2010, Blain sent Mr. Lentini a Dealer Consultant Daily Business Report from Blain's personal fax machine.  The fax line or header at the top of that fax read, "Dan Blain Guardlan [*sic*] Warran 480-------." (the specific numbers have been omitted herein to protect against disclosure of the fax number).  A true and correct copy of the first page of this facsimile, with redactions made to conceal the fax number and also to protect against disclosure of Guardian confidential information, is attached hereto as *Exhibit B*.

23.     On or about December 15, 2010, Blain advised Mr. Lentini that he would be sending him a document via facsimile.  He stated that he was in his driveway and just needed to run into his house to send it.  That same day, Blain sent Mr. Lentini a First Quarter Business Template 2011.  The header at the top of that fax, also from Blain's personal fax machine, read, "Aul Corp 480-------." (the fax number was the same).  A true and correct copy of the first page of this facsimile, with redactions made to conceal the fax number and also to protect against disclosure of Guardian confidential information, is attached hereto as *Exhibit C*.

24.     In other words, the fax number was identical, however, the company name was different.  In September, his fax header indicated that Blain was sending a fax for Guardian.  In December, Blain's fax header indicated that Blain was sending a fax for AUL.

25.     Blain sent another fax on January 3, 2011, and the fax line again referred to "Aul Corp."  A true and correct copy of the first page of this facsimile, with redactions made to conceal the fax number and also to protect against disclosure of Guardian confidential information, is attached hereto as *Exhibit D*.

26.     AUL is a Nevada corporation headquartered in Napa, California.  AUL is in the business of providing vehicle service contracts and is a direct competitor of Guardian.

27.     Guardian also just learned from one of its dealer customers in Las Vegas, Nevada, for which Blain was responsible, that "someone" told the dealer that Guardian was "cutting it off," and the dealership has informed Guardian that it is therefore moving its business to AUL.  Guardian has never cut off this dealership, and as Blain was responsible for this dealership, Guardian, on information and belief, believes that Blain made the statement or caused such a statement to be made to the dealer.

28.     Based upon the above, Guardian believes that Blain had been working for both AUL and Guardian while he was employed with Guardian (and thereby selling AUL products in addition to Guardian products.

### Damage Allegations

29.     Upon information and belief, Blain diverted business from Guardian to AUL.

30.     Upon information and belief, Blain has continued to or plans to continue to work for AUL following his termination of employment with Guardian.

31.     Each of the acts and omissions alleged herein singularly or in combination with others, as described and identified herein, constitute breach of fiduciary duty, breach of contract and/or other wrongful conduct.  As a direct and proximate cause of Defendant's conduct set forth herein, Guardian has been, or is at immediate risk of being, irreparably damaged, and is entitled to injunctive relief to prevent the same and damages to the extent that any harm that cannot be remedied by injunctive relief.

32.     As a direct and proximate result of Defendant's conduct described above, Guardian has lost, or is at immediate risk of losing, uncertain and possibly indeterminable amounts of money.   Additionally, considering the ongoing nature of Defendant's activities, the total, potential loss to Guardian cannot be accurately measured.  Furthermore, unless Defendant is enjoined as requested herein, Guardian will suffer irreparably harm, to which it has no adequate remedy at law.  Defendant has no legitimate

interest in engaging in such egregious misconduct.

33.     If Defendant is permitted to continue the wrongs described herein, he will have profited from his wrongs, resulting in immeasurable damages to Guardian that are unpredictable, uncertain, and unending.  Unless restrained as requested herein, there also exists substantial risk that Defendant will be unable to answer in money damages.

34.     Unless Defendant is enjoined from further breaches, Guardian is at immediate risk of irreparable harm by, among other things, a loss of customers, loss of confidence and trust of customers, loss of good will, and loss of business reputation as well as present economic loss, which is uncertain at this time, and future economic loss, which is presently incalculable.

35.     The balance of the equities requires the issuance of a temporary restraining order, which is necessary to maintain the status quo.  The granting of injunctive relief will restore the parties to the status quo as it existed immediately prior to Defendant's wrongful conduct.

36.     Guardian is at immediate risk of suffering far greater harm if the Court were to deny temporary injunctive relief, as compared to the harm that Defendant would suffer if the Court grants such relief.  Additionally, a temporary restraining order or preliminary injunction would not substantially harm Defendant.

37.     The injunctive relief Guardian seeks is reasonably suited to abate the wrongful activity described herein.

38.     The activity that Guardian seeks to restrain is actionable, its right to relief is clear, and the wrong is manifest.  Guardian is likely to prevail on the merits of its claims against Defendant.

39.     The award of injunctive relief will not harm the public interest.

### COUNT I
### BREACH OF FIDUCIARY DUTY

40.     The allegations set forth in Paragraphs 1-39 above are incorporated by reference herein.

41.     As an employee of Guardian, Blain had a fiduciary duty not to harm Guardian by working for a competitor selling the very same types of vehicle service contracts he was charged with selling for Guardian, and not to divert Guardian opportunities to himself or one of Guardian's competitors.

42.     Blain breached his common law fiduciary duties by, *inter alia*, working for AUL while he was an employee of Guardian.  On information and belief, Blain sold vehicle service contracts for AUL at the same time he was to be selling them for Guardian, and thereby diverted Guardian opportunities away from Guardian.

43.     Blain's breaches have caused and will continue to cause Guardian irreparable harm for which there is no remedy at law.

**COUNT II**
**BREACH OF CONTRACT – The Employment Agreement**

44.     The allegations set forth in Paragraphs 1-43 above are incorporated by reference herein.

45.     The Employment Agreement restricts Blain from competing with Guardian within the defined territory, and from soliciting Guardian's customers.  Blain also cannot disclose Guardian's information.  Further, the Employment Agreement prohibited Blain from working for another entity while he was employed by Guardian.  Blain was to devote his "entire services" to Guardian.

46.     The restrictions in the Employment Agreement were supported by adequate consideration.

47.     The restrictions in the Employment Agreement were intended to protect Guardian's customer good will, its substantial relationships with customers, its trade secrets and confidential information, and other valid business interests of Guardian.  The restrictions are reasonably necessary for Guardian's protection.

48.     The restrictions in the Employment Agreement were reasonably and narrowly tailored to protect Guardian's legitimate business interests.  The restrictions are reasonably limited in duration and geographic scope.

49.     Despite the contractual prohibitions to which Blain agreed, he has materially violated the same.  Blain' violations have been knowing, willing, and voluntary.

50.     As a result of Blain' actions, Guardian reasonably anticipates the loss of good will with its customers and substantial, yet largely incalculable and irreparable, revenues.

51.     Guardian has performed all of its obligations under the Employment Agreement.

**COUNT III**
**<u>TORTIOUS INTERFERENCE WITH CONTRACTS</u>**

52.     The allegations set forth in Paragraphs 1-51 above are incorporated by reference herein.

53.     Guardian has contracts with numerous customers, including the car dealership in Las Vegas, Nevada identified herein.

54.     Guardian would have continued its contracts and business relations with this dealership (and other customers), and would have entered into new relationships and have enjoyed further sales, if not for Blain's intentional interference with existing contracts, and existing customer relationships by working for AUL while he also was working for Guardian.

55.     There was a reasonable probability that these automotive dealership customers would have continued their business relationships with Guardian.  There was a reasonable probability that Guardian would have entered into business relationships with these and other clients to sell warranties and other of its offerings because Guardian had ongoing business relationships with these customers.

56.     Blain has or had the desire to harm Guardian by interfering with such relationships and/or knew that the interference was substantially certain to occur as a result of his conduct.

57.     To the extent that Plaintiff has the obligation to so plead, Plaintiff pleads that Defendant has no legal right, privilege or justification to conduct such tortious interference

against Guardian.

58.     As a result of Defendant's tortious interference, Guardian has suffered actual damage, including harm to its business reputation and good will with its customers.  By having to take action to enforce its legal rights, Guardian will suffer additional harm to its business reputation and good will.

**COUNT IV**
**TORTIOUS INTERFERENCE**
**WITH PROSPECTIVE BUSINESS RELATIONS**

59.     The allegations set forth in Paragraphs 1-58 above are incorporated by reference herein.

60.     Guardian had prospective business relations with numerous customers, including the Las Vegas car dealership identified above.

61.     Guardian would have obtained business from these prospective business relations, and would have entered into new contracts and have enjoyed further sales, if not for Defendant's intentional interference with prospective business relationships. Defendant interfered with these prospective relations with the purpose or intent to harm Guardian by preventing the relation from occurring.

62.     There was a reasonable probability that Guardian would have entered into business relationships with these and other clients to sell its products.

63.     Blain's actions constitute tortious interference with prospective business relations.

64.     Defendant had or has the desire to harm Guardian by interfering with such prospective business relationships and/or he knew the interference was substantially certain to occur as a result of his conduct.  As a result of Defendant's actions, Plaintiff has lost opportunities for future sales, and contractual relationships, with at least one of its customers.

65.     To the extent that Plaintiff has the obligation to so plead, Plaintiff pleads that Defendant has no legal right, privilege or justification to conduct such tortious interference against Guardian.

66.     As a result of Defendant's tortious interference, Guardian has suffered actual damage, including harm to its business reputation and good will with its customers.  By having to take action to enforce its legal rights, Guardian will suffer additional harm to its business reputation and good will.

## PRAYER FOR RELIEF

WHEREFORE, Guardian respectfully requests that the Court enter judgment in its favor and grant it the following relief:

1.     A temporary restraining order, preliminary injunction, and permanent injunction, restraining Blain from:

> a.     directly or indirectly soliciting or accepting business from any company which was a customer, agent or prospect of Guardian during his employment;

> b.     directly or indirectly competing with Guardian in violation of the agreements set forth herein; and

> c.     disclosing Guardian's proprietary, confidential and trade secret information.

2.     An order granting preliminary and permanent injunctive relief in accord with No. 1 herein and as separately may be requested at a preliminary injunction hearing and any trial.

3.     An order requiring Defendant to provide an accounting of all amounts earned by Defendant from AUL while he was employed by Guardian, and also accounting for all diverted sales.

4.     An order requiring Defendant to disgorge all amounts earned by Defendant from AUL while he was employed by Guardian.

5.     An order awarding Guardian its actual damages in excess of $75,000, in an amount to be determined at trial.

6.     An order awarding Guardian its attorneys' fees and costs.

7.     Such further relief as is just and appropriate.

11

1    Dated:  January 10, 2011

2                                    **HOLLOWAY ODEGARD FORREST & KELLY, P.C.**

3

4                          By:      s/ Larry J. Wulkan
                                   Stephen Paul Forrest
5                                   Larry J. Wulkan
                                   3101 N. Central Avenue, Suite 1200
6                                   Phoenix, Arizona  85012

7                                   Douglas A. Albritton
                                   Abigail D. Flynn-Kozara
8                                   **REED SMITH LLP**
                                   10 South Wacker, 40th Floor
9                                   Chicago, Illinois 60606

10                                  Attorneys for Plaintiff The GWC Warranty
                                   Corporation

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28